## MONTGOMERY BROS. v. HALL. (No. 8240.)

(Court of Civil Appeals of Texas. Galveston. April 26, 1923. Rehearing Denied May 17, 1923.)

1. **Brokers ☾57(1)—Transaction held "sale," not an exchange for which broker was not entitled to commission.**

In an action for broker's commission for sale of land, *held*, that a transaction negotiated whereby the defendants received notes for the payment of the greater part of the consideration in money, only a small part of such consideration being the transfer of an equity in land owned by the buyer, was a sale within the terms of the brokerage contract, and not an exchange for which the broker would not be entitled to commission; "sale" being a word of precise legal import, both at law and in equity. It means a contract between parties to take and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Sale.]

2. **Brokers ☾53—Broker's services other than in finding purchaser held insufficient to warrant allowance of commission.**

Under a contract to pay broker a commission for assisting in sale of land, the fact that a purchaser, not procured by the broker or induced by him to buy, was shown the land by the broker, and that such broker had the abstract brought down to date and furnished the owner with blank forms, did not entitle him to a commission.

3. **Brokers ☾48—Merely nominal services disconnected with transaction not entitling broker to commission.**

Where a brokerage contract contemplates that services of a broker to entitle him to a commission shall be assistance in finding a purchaser or inducing some one to buy the land, services of merely nominal value and which have no relation to procuring a purchaser or inducing him to buy cannot entitle the broker to commission.

Appeal from District Court, Anderson County; W. R. Bishop, Judge.

Suit by C. Roe Hall against Montgomery Bros. Judgment for plaintiff, and defendants appeal. Reversed and rendered.

B. H. Gardner, of Palestine, and Kenworthy, Dietz, Shallberg, Harper & Sinnett, of Moline, Ill., for appellants.

Seagler & Pickett, of Palestine, for appellee.

PLEASANTS, C. J. This suit was brought by appellee against appellants. Plaintiff sued to recover the sum of $1,350, alleged to be due him by defendants upon a contract made by them with plaintiff, who was a land agent and resided in Anderson county, by the terms of which defendants agreed to pay plaintiff a commission of 5 per cent. for assisting them in making sale of certain lands owned by them in Anderson county.

Defendants, who were nonresidents of this state, in addition to a plea to the jurisdiction of the court based upon the alleged insufficiency of the attachment proceedings under which the jurisdiction of the court was sought to be obtained, answered by general demurrer and general denial.

The plea to the jurisdiction was overruled, and the trial of the cause on its merits, without a jury, resulted in a judgment in favor of plaintiff for the amount claimed by him. No complaint is made here of the ruling of the trial court upon the plea of jurisdiction.

At the request of the defendants the trial court filed the following findings of fact and conclusions of law:

### "Findings of Fact.

"1. The court finds that plaintiff and defendants entered into the contract as alleged in plaintiff's petition.

"2. The court finds that a sale of the land mentioned in plaintiff's petition was made by defendants to Henry O. Ritzman on or about the 1st day of June, 1920, for the consideration of $27,000.

"3. The court finds that the defendants exercised their option under said contract to call upon plaintiff to assist in making said sale, and did call upon plaintiff for assistance in making the sale aforesaid.

"4. The court finds that the plaintiff rendered assistance to defendants in making the sale of said land as aforesaid.

### "Conclusions of Law.

"The court concludes, as a matter of law, that the plaintiff is entitled to recover of defendants 5 per cent. of the sale price of said land. The sale price of said land being $25,000, plaintiff is entitled to recover the sum of $1,350."

Under appropriate assignments of error and propositions, appellants attack the trial court's findings of fact and judgment on the ground that the evidence is insufficient to sustain the findings.

The material evidence disclosed by the record is as follows:

Plaintiffs, who are residents of Rock Is-

---

☾For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

land in the state of Illinois, on and prior to October 4, 1919, owned a number of surveys of land situated in Anderson county, Tex. On the date last mentioned appellee, who was a land agent, and resided in Anderson county, Tex., wrote the following letter to appellants:

"Gentlemen: Replying to yours of the 27th ulto., with reference to me looking after your lands in this county, consisting of about 3,500 acres, would say, I will agree to make a personal inspection of these lands once each year, or oftener if necessary, and make a report of the condition of same on or before December 1, 1919, and each year thereafter on the same date for $100 each year—beginning with December 1, 1919.

"I will go immediately after your approval to this, and make a personal inspection of your #11, and render a report as to matter of squatters or encroachments, and will forward report for other land on or before December 1, 1919. Also—will assist in any way possible in getting off the squatter, if you have one, but am to be to no expense in matter of attorney fees or court costs, but to furnish my time in assisting in such cases, and advise as to my judgment in the matter of squatters.

"Also—will render these lands for taxes each year, and at the best price possible for you. However, if I should assist in making sale of these lands, if you place them upon the market for sale, I would expect the usual 5 per cent. commission, but it would be at your option about the sale of same, or my assisting you. In event I should sell out my holdings and leave this county, it would cancel this agreement.

"Yours truly,      [Signed]  C. Roe Hall."

This letter was received by appellants and returned to appellee with the following agreement' signed by appellants, written thereunder: "We agree to the above and retain copy of same."

Some time prior to March 11, 1920, the appellants through Mr. Read, a land agent at Moline, Ill., began negotiations for the exchange of some of appellants' Texas lands for a farm in Illinois, and on the date named wrote appellee as follows:

"Mr. Read of Moline and some of his associates have a deal on for some of our Texas land, and should they write you in regard to it, please give them a good report and valuation. It is a trade proposition and their properties are considerable inflated."

On April 9, 1920, appellants wrote appellee as follows:

"As to Mr. Read and the price to be quoted on the land, we are not just sure of this at this writing, as he has some prospects for cash and some where trade will be included, so price will vary. We will doubtless hear from him shortly, and we will write you again or have him write you direct before he goes down there or to see you when he goes."

Mr. Ritzman with a Mr. Reitzel, a representative of Mr. Read, went to Texas to inspect appellants' land and were in Palestine on April 20th. Appellee's statement as to his connection with the exchange of the property and the services rendered by him in effecting the exchange is as follows:

"On the 21st day of April, 1920, at noon time, or immediately after 1 o'clock, I had a phone call from H. O. Ritzman and a man named Norman G. Reitzel, asking me to come to my office, they wanted to see me about the Montgomery Bros. lands in this county, and I went immediately to my office, and they were standing at the steps waiting for me, and we went on up to the office, and they asked me about the lands, and wanted to go out and look at them. So I took them that afternoon and showed them this 1985²/₁₀ acres of land, and we got back rather late that evening, and then after supper we met again at the office and stayed there until the late train that night. They came in on the Sunshine in the afternoon and left that night on No. 4, about 10 o'clock that night. They wanted to look at Montgomery Bros.' land, and they said they were there in the interest of Mr. Read. And I explained to them I had had correspondence from Montgomery Bros. with reference to this land. They asked me the usual questions that people usually do from the North down here, knowing I was from the North, too. I was raised in Iowa, just across the river from their home in Illinois. And they were acquainted in Iowa. As a real estate agent I certainly boosted the land to them. I told them the good side of it. I showed it to them at an advantage. This man, H. C. Ritzman, was the prospective purchaser. He was figuring on buying the land. I knew he was there on account of Mr. Read. The other man, Norman G. Reitzel, was, I understand, agent and Ritzman was the buyer, or one of the buyers. I paid for the transportation out to see the land, I made a report to the Montgomerys of the coming of these parties to see their land. This report was made by first mail on the 22d. * * *

."My action in showing the land to these parties was based upon the correspondence in evidence and upon the statement of these parties who came to see me. As to what I did after these parties left, well, the Montgomerys had me bringing these abstracts down to date, and some of the abstracts were up there and some were here, as I remember, in my office—anyway, I had them all brought down to date, and forwarded to them by registered mail, according to their request, not specially registered by their request, but I wanted to be sure to get them. The Texas forms and things like that, I sent forms for deed, and six or seven forms of vendor's lien notes, which I had in my office. The Montgomerys never notified me as to when they closed the deal. About August, 1920, I was advised that the deed from the Montgomerys to Ritzman was on record and I came over and looked at it, and thus discovered that this deed had been closed. It was made in June, 1920. Afterwards I demanded my commissions from Montgomery Bros., but they did not pay me. Did not reply to my letter and have not yet paid."

The evidence shows that the Illinois farm, which appellants received in exchange for the 1,985 acres of Texas land, had a mortgage thereon of $24,000, and that the equity

in the farm, appellants having assumed the mortgage, was valued at $4,000. In addition to this equity appellants received vendor's lien notes on the 1,985 acres of Texas land for the sum of $23,000, making the total consideration received by them for their land $27,000.

Counsel for appellants take the position that the transaction between them and Mr. Ritzman, by which the latter acquired the 1,985 acres of land, was not a sale but an exchange of lands, and therefore was not within the purview of appellants' contract to pay appellee a 5 per cent. commission if he should assist them in making a sale of any of their lands in Anderson county.

[1] In support of this proposition several authorities are cited, among which is Williamson v. Berry, 8 How. 495, 12 L. Ed. 1170, in which the Supreme Court of the United States says:

"Sale is a word of precise legal import, both at law and in equity. It means * * * a contract between parties, to take and to pass rights of property for money, which the buyer pays or promises to pay to the seller for the thing bought and sold."

This statement of the legal meaning of the word "sale" is also given in Benjamin on Sales (6th Am. Ed.) p. 8, and in Edwards v. Cottrell, 43 Iowa, 204; Bigley v. Risher, 63 Pa. 155.

We think the transaction comes within this definition. Much the larger portion of the consideration received by appellants for their land was the promise of the buyer, as evidenced by his notes, to pay appellants in money the sum of $23,000. The fact that appellants also received as a part of the consideration an equity in an Illinois farm valued at $4,000 would not authorize the holding that the transaction was not a sale in the legal sense of the word, nor the sense in which it was used in the contract. We agree with appellants, however, that the service performed by appellee in this transaction was not such assistance in making the sale of the land as was contemplated by the parties to the contract as entitling him to a commission of 5 per cent. on the amount received by appellants for the land.

[2] Appellee had nothing to do with procuring the purchaser or inducing him to buy the land. It is true that he took Mr. Ritzman in a taxi from Palestine out to the land and showed it to him, but this was not done at the request of appellants. The fact that the purchaser may have called upon appellee to show him the land, rather than get some one else to show it to him, could not bind appellants to pay appellee a commission for selling the land.

Ritzman testified:

"Neither of the Montgomerys directed me or any agent of mine at any time to C. Roe Hall. I did visit Anderson county, Tex., and met C. Roe Hall about April 21, 1920. Mr. Norman G. Reitzel was with me. Neither of the Montgomerys had any connection whatever with my visit to Anderson county, Tex., nor with my meeting with C. Roe Hall. * * * Mr. J. C. H. Read, of Moline, Ill., and Mr. Norman G. Reitzel, of Sterling, Ill., approached me with reference to the exchange of these lands and all of my transactions with reference to same were had with Mr. Read and Mr. Reitzel. So far as I am concerned, Mr. C. Roe Hall had no connection whatever in bringing about the exchange, except that Mr. Reitzel and I met Mr. Hall in Palestine, Tex., and Mr. Hall drove out to the land with us in a taxi and showed us that said land. * * * Mr. Hall had no part in the actual transaction involving the exchange of the lands; advised us that he did not know what price the Montgomerys were - asking for it."

The only other services claimed to have been rendered by appellee in the transaction were having the abstract of title brought down to date and furnishing appellants with a blank deed and several blank vendor's lien notes. The cost of the addition to the abstract is not shown, but the correspondence between the appellants and appellee in regard to having the abstract completed shows that appellants were to pay the abstractor's fee.

[3] It certainly cannot be held that appellee, in complying with appellants' request to have the abstract completed and to send appellants a form of a Texas deed and several blank forms of vendor's lien notes, was rendering such assistance in making a sale of the land as would entitle him under his contract to 5 per cent. commission.

The assistance in making a sale of the land which was contemplated by the parties to the contract as entitling appellee to a commission was assistance in finding a purchaser, or inducing some one to buy the land. Services of a merely nominal value and which had no relation to procuring a purchaser or inducing him to buy cannot create a liability on the part of appellants to pay appellee a commission of $1,350, simply because they were rendered in connection with the sale of the land.

We think the undisputed evidence shows that appellee has rendered no services to appellants which would entitle him to the commission claimed by him.

If his services had any value, his pleading does not authorize a recovery on a quantum meruit. It follows from these conclusions that the judgment of the court below should be reversed and judgment here rendered for appellants, and it has been so ordered.

Reversed and rendered.